# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## AT LEXINGTON
### [Filed Electronically]

| | | |
|---|---|---|
| **YVONNE DAY** | ) | **PLAINTIFFS** |
| | ) | |
| **and** | ) | |
| | ) | |
| **LEONARD HASLAG** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **JAMES McCORMICK** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **JOHN W. TURNER,** | ) | |
| | ) | |
| **on behalf of themselves and others** | ) | |
| **similarly situated** | ) **CASE NO. _____** | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **FORTUNE HI-TECH MARKETING, INC.** | ) | **DEFENDANTS** |
| **880 Corporate Drive, Suite 300** | ) | |
| **Lexington, Kentucky  40503** | ) | |
| | ) | |
| **SERVE:** | ) | |
| **Thomas A. Mills** | ) | |
| **880 Corporate Drive, Suite 300** | ) | |
| **Lexington, Kentucky  40503** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **PAUL C. ORBERSON** | ) | |
| **President/Director** | ) | |
| **Fortune Hi-Tech Marketing, Inc.** | ) | |
| **880 Corporate Drive, Suite 300** | ) | |
| **Lexington, Kentucky  40503** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |

**JEFF ORBERSON**                                        )
**Chief Business Officer**                               )
**Fortune Hi-Tech Marketing, Inc.**                      )
**880 Corporate Drive, Suite 300**                       )
**Lexington, Kentucky  40503**                           )
                                                         )
**and**                                                  )
                                                         )
**THOMAS A. MILLS**                                      )
**Vice President/Chief Executive Officer**               )
**Fortune Hi-Tech Marketing, Inc.**                      )
**880 Corporate Drive, Suite 300**                       )
**Lexington, Kentucky  40503**                           )
                                                         )
**and**                                                  )
                                                         )
**DAVID MILLS**                                          )
**Chief Operating Officer**                              )
**Fortune Hi-Tech Marketing, Inc.**                      )
**880 Corporate Drive, Suite 300**                       )
**Lexington, Kentucky  40503**                           )
                                                         )
**and**                                                  )
                                                         )
**BILLY STAHL**                                          )
**Senior Executive Vice President of**                   )
**  Marketing and Training**                             )
**Fortune Hi-Tech Marketing, Inc.**                      )
**880 Corporate Drive, Suite 300**                       )
**Lexington, Kentucky  40503**                           )
                                                         )
**and**                                                  )
                                                         )
**SIMON DAVIES**                                         )
**Chief Financial Officer**                              )
**Fortune Hi-Tech Marketing, Inc.**                      )
**880 Corporate Drive, Suite 300**                       )
**Lexington, Kentucky  40503**                           )
                                                         )
**and**                                                  )
                                                         )
**RUEL MORTON**                                          )
**1 Wellington Drive**                                   )
**Longview, TX 75605-2017**                              )
                                                         )
**and**                                                  )

**TODD ROWLAND**                                    )
**1000 Lowes Blvd.**                                )
**Mooresville, NC 28117-8520**                      )
                                                    )
**and**                                             )
                                                    )
**ASHLEY ROWLAND**                                  )
**1000 Lowes Blvd.**                                )
**Mooresville, NC 28117-8520**                      )
                                                    )
**and**                                             )
                                                    )
**TODD & ASHLEY, INC.**                             )
**261 Knoxview Lane**                               )
**Mooresville, North Carolina 28117**               )
                                                    )
**and**                                             )
                                                    )
**MIKE MISENHEIMER**                                )
**11725 Stage Coach Road**                          )
**Gravette, AR 72736-9248**                         )
                                                    )
**and**                                             )
                                                    )
**STEVE JORDAN**                                    )
**3315 Heritage Drive**                             )
**Claremore, OK 74019-4989**                        )
                                                    )
**and**                                             )
                                                    )
**JOEL McNINCH**                                    )
                                                    )
     **SERVE:**             )
     **Fortune Hi-Tech Marketing, Inc.**   )
     **880 Corporate Drive, Suite 300**     )
     **Lexington, Kentucky  40503**         )
                                                    )
**and**                                             )
                                                    )
**CHRIS DOYLE**                                     )
**62 Haverhill Drive**                              )
**Jackson, TN 38305-8506**                          )
                                                    )
**and**                                             )
                                                    )

3

**KEN BROWN**                                              )
                                                          )
 **SERVE:**                                                )
    **Fortune Hi-Tech Marketing, Inc.**          )
    **880 Corporate Drive, Suite 300**             )
    **Lexington, Kentucky  40503**                 )
                                                          )
**and**                                                    )
                                                          )
**JERRY BROWN**                                            )
                                                          )
 **SERVE:**                                                )
    **Fortune Hi-Tech Marketing, Inc.**          )
    **880 Corporate Drive, Suite 300**             )
    **Lexington, Kentucky  40503**                 )
                                                          )
**and**                                                    )
                                                          )
**BOB DECANT**                                             )
**754 N. Decant Road**                                     )
**Oregon, OH 43616-5889**                                  )
                                                          )
**and**                                                    )
                                                          )
**JOANNE McMAHON**                                         )
**J.T. McMahon**                                           )
**3540 Secor Rd., Ste 301**                                )
**Toledo, OH 43606-1538**                                  )
                                                          )
**and**                                                    )
                                                          )
**TERRY WALKER**                                           )
**2022 E. Lakeview**                                       )
**Benton, AR 72015-2799**                                  )
                                                          )
**and**                                                    )
                                                          )
**SANDI WALKER**                                           )
**19617 Congo Ferndale Rd.**                               )
**Little Rock, AR 72210-5691**                             )
                                                          )
**and**                                                    )
                                                          )
**SHERRI WINTER**                                          )
                                                          )
    **SERVE:**                                    )

**Fortune Hi-Tech Marketing, Inc.** )
**880 Corporate Drive, Suite 300** )
**Lexington, Kentucky 40503** )
)
**and** )
)
**TREY KNIGHT** )
**701 Columbia Rd.** )
**Titusville, FL 32780-7902** )
)
**and** )
)
**KEVIN MULLINS** )
)
**SERVE:** )
    **Fortune Hi-Tech Marketing, Inc.** )
    **880 Corporate Drive, Suite 300** )
    **Lexington, Kentucky 40503** )
)
**and** )
)
**SCOTT AGUILAR** )
**6845 Osterling Crt.** )
**San Diego, CA 92114-7828** )
)
**and** )
)
**MOLLY AGUILAR** )
**755 Wala Drive** )
**Oceanside, CA 92058-0616** )
)
**and** )
)
**NATHAN KIRBY** )
**4520 Old Village Rd.** )
**Raleigh, NC 27612-3930** )
)
**and** )
)
**DWAYNE BROWN** )
**480 Monticello Drive** )
**Auburn, AL 36830-1427** )
)
**and** )
)
**AARON DECKER** )

5

**443 Lawrence Street**      )
**Bellevue, OH 44811-1631**      )
      )
**and**      )
      )
**SUSAN FRANK**      )
**2030 Sierra Trace Road**      )
**Denton, NC 27239**      )
      )
**and**      )
      )
**RAMIRO ARMENTA**      )
**5414 Salma St.**      )
**Plainfield, IL 60586-5585**      )
      )
**and**      )
      )
**ANGELINA ARMENTA**      )
**384 Thelma Ct.**      )
**Wheeling, IL 60090-4434**      )
      )
**and**      )
      )
**ALEXIS ADAME**      )
**2694 Avenue H**      )
**Ingleside, TX 78362-6302**      )
      )
**and**      )
      )
**TERESA ADAME**      )
**114 Huisache Street**      )
**Crystal City, TX**      )
      )
**and**      )
      )
**DARLA DiGRANDI**      )
      )
**SERVE:**      )
      **Fortune Hi-Tech Marketing, Inc.**      )
      **880 Corporate Drive, Suite 300**      )
      **Lexington, Kentucky  40503**      )
      )
**and**      )
      )
**MATT MORSE**      )
**308 Mead Street**      )

Lake City, AR 72437-9592                    )
                                            )
and                                         )
                                            )
MATT BARRETT                                )
829 Montevideo Dr., Apt. 22                 )
Lansing, MI 48917-4833                      )
                                            )
and                                         )
                                            )
ROBERTO RIVERA                              )
2509 Trinity Street                         )
Irving, TX 76062-5258                       )

** ** ** **

## CLASS ACTION COMPLAINT

Plaintiffs Yvonne Day, Leonard Haslag, James McCormick, and John W. Turner, by counsel and on behalf of themselves and others similarly situated, for their Class Action Complaint, state as follows:

## INTRODUCTION

1.      This is an action by plaintiffs on behalf of themselves and those similarly situated to recover damages caused by the defendants' operation of an inherently fraudulent pyramid scheme. The pyramid scheme is fraudulent because it requires the payment by participants of money to defendant Fortune Hi-Tech Marketing, Inc. ("Fortune"), in return for which participants receive (1) the right to sell products and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users.

2.      This action is brought on behalf of a national class of persons who serve or have served as independent representatives for Fortune, pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961-1968 ("RICO"), the Kentucky Consumer Protection Act, KRS Chapter 367, and the laws of Kentucky.

## PARTIES

3.      Plaintiff Yvonne Day is and was at all times relevant to the allegations in this complaint a resident of Comal County, Texas and a citizen of the United States.

4.      Plaintiff Leonard Haslag is and was at all times relevant to the allegations in this complaint a resident of Osage County, Missouri and a citizen of the United States.

5.      Plaintiff James McCormick is and was at all times relevant to the allegations in this complaint a resident of Pasco County, Florida and a citizen of the United States.

6.       Plaintiff John W. Turner is and was at all times relevant to the allegations in this complaint a resident of  Comal County, Texas and a citizen of the United States.

7..      Defendant Fortune Hi-Tech Marketing, Inc. is a Kentucky corporation with a principal office at 880 Corporate Drive, Suite 300, Lexington, Kentucky 40503.

8.      Defendant Paul C. Orberson, the president, founder and director of Fortune, is and was at all times relevant to the allegations in this complaint a resident of Fayette County, Kentucky and a citizen of the United States.

9.      Defendant Thomas A. Mills, the Chief Executive Officer of Fortune, is and was at all times relevant to the allegations in this complaint a resident of  Fayette County, Kentucky and a citizen of the United States.

10.      Defendant David Mills, the Chief Operating Officer of Fortune, is and was at all times relevant to the allegations in this complaint a resident of Fayette County, Kentucky and a citizen of the United States.

11.      Defendant Jeff Orberson, the Chief Business Officer of Fortune, is and was at all times relevant to the allegations in this complaint a resident of Fayette County, Kentucky and a citizen of the United States.

12.     Defendant Ruel Morton is and was at all times relevant to the allegations in this complaint a resident of Gregg County, Texas and a citizen of the United States.  Morton is a Presidential Ambassador for Fortune.

13.     Defendant Todd Rowland is and was at all times relevant to the allegations in this complaint a resident of Iredell County, North Carolina and a citizen of the United States.  Mr. Rowland is a Presidential Ambassador for Fortune.

14.     Defendant Ashley Rowland is and was at all times relevant to the allegations in this complaint a resident of Iredell County, North Carolina and a citizen of the United States.  Ms. Rowland is a Presidential Ambassador for Fortune.

15.     Defendant Todd & Ashley, Inc. ("Todd & Ashley") is a North Carolina corporation, operated by Todd & Ashley Rowland, with its principal office located at 261 Knoxview Lane, Mooresville, NC 28117.

16.     Defendant Mike Misenheimer is and was at all times relevant to the allegations in this complaint a resident of Benton County, Arkansas and a citizen of the United States.  Misenheimer is a Presidential Ambassador for Fortune.

17.     Defendant Steve Jordan is and was at all times relevant to the allegations in this complaint a resident of Madison County, Tennessee and a citizen of the United States.  Jordan is a Presidential Ambassador for Fortune.

18.     Defendant Joel McNinch is and was at all times relevant to the allegations in this complaint a resident of Oakland County, Michigan and a citizen of the United States.  McNinch is a Presidential Ambassador for Fortune.

19.      Defendant Chris Doyle is and was at all times relevant to the allegations in this complaint a resident of Dallas County, Texas and a citizen of the United States.  Doyle is a Presidential Ambassador for Fortune.

20.      Defendant Ken Brown is and was at all times relevant to the allegations in this complaint a resident of Stanislaus County, California and a citizen of the United States.  Ken Brown is a National Sales Manager for Fortune.

21.      Defendant Jerry Brown is and was at all times relevant to the allegations in this complaint a resident of Fulton County, Georgia and a citizen of the United States.  Jerry Brown is a National Sales Manager for Fortune.

22.      Defendant Bob Decant is and was at all times relevant to the allegations in this complaint a resident of Lucas County, Ohio and a citizen of the United States.  Decant is a National Sales Manager for Fortune.

23.      Defendant Joanne McMahon is and was at all times relevant to the allegations in this complaint a resident of Lucas County, Ohio and a citizen of the United States.  McMahon is a National Sales Manager for Fortune.

24.      Defendant Terry Walker is and was at all times relevant to the allegations in this complaint a resident of Saline County, Arkansas and a citizen of the United States.  Terry Walker is a National Sales Manager for Fortune.

25.      Defendant Sandi Walker is and was at all times relevant to the allegations in this complaint a resident of Saline County, Arkansas and a citizen of the United States.  Sandi Walker is a National Sales Manager for Fortune.

26.      Defendant Sherri Winter is a resident of Gregg County, Texas and a citizen of the United States.  Winter is a National Sales Manager for Fortune.

27.     Defendant Trey Knight is and was at all times relevant to the allegations in this complaint a resident of Duval County, Florida and a citizen of the United States.  Knight is a National Sales Manager for Fortune.

28.     Defendant Kevin Mullins is and was at all times relevant to the allegations in this complaint a resident of Leon County, Florida and a citizen of the United States.  Mullins is a National Sales Manager for Fortune.

29.     Defendant Scott Aguilar is and was at all times relevant to the allegations in this complaint a resident of San Diego County, California and a citizen of the United States.  Scott Aguilar is a National Sales Manager for Fortune.

30.     Defendant Molly Aguilar is and was at all times relevant to the allegations in this complaint a resident of San Diego County, California and a citizen of the United States.  Molly Aguilar is a National Sales Manager for Fortune.

31.     Defendant Nathan Kirby is and was at all times relevant to the allegations in this complaint a resident of San Diego County, California and a citizen of the United States.  Kirby is a National Sales Manager for Fortune.

32.     Defendant Dwayne Brown is and was at all times relevant to the allegations in this complaint a resident of Lee County, Alabama and a citizen of the United States.  Brown is a National Sales Manager for Fortune.

33.     Defendant Aaron Decker is and was at all times relevant to the allegations in this complaint a resident of Kent County, Michigan and a citizen of the United States.  Decker is a National Sales Manager for Fortune.

34.     Defendant Susan Frank is and was at all times relevant to the allegations in this complaint a resident of Davidson County, North Carolina and a citizen of the United States.  Frank is a National Sales Manager for Fortune.

35.     Defendant Ramiro Armenta is and was at all times relevant to the allegations in this complaint a resident of Will County, Illinois and a citizen of the United States.  Ramiro Armenta is a National Sales Manager for Fortune.

36.     Defendant Angelina Armenta is and was at all times relevant to the allegations in this complaint a resident of Will County, Illinois and a citizen of the United States.  Angelina Armenta is a National Sales Manager for Fortune.

37.     Defendant Alexis Adame is and was at all times relevant to the allegations in this complaint a resident of Cook County, Illinois and a citizen of the United States.  Alexis Adame is a National Sales Manager for Fortune.

38.     Defendant Teresa Adame is and was at all times relevant to the allegations in this complaint a resident of Cook County, Illinois and a citizen of the United States.  Teresa Adame is a National Sales Manager for Fortune.

39.     Defendant Darla DiGrandi is and was at all times relevant to the allegations in this complaint a resident of San Diego County, California and a citizen of the United States.  DiGrandi is a National Sales Manager for Fortune.

40.     Defendant Matt Morse is and was at all times relevant to the allegations in this complaint a resident of Craighead County, Arkansas and a citizen of the United States.  Morse is a National Sales Manager for Fortune.

41. Defendant Matt Barrett is and was at all times relevant to the allegations in this complaint a resident of Ingham County, Michigan and a citizen of the United States. Barrett is a National Sales Manager for Fortune.

42. Defendant Roberto Rivera is and was at all times relevant to the allegations in this complaint a resident of Dallas County, Texas and a citizen of the United States. Rivera is a National Sales Manager for Fortune.

<u>JURISDICTION AND VENUE</u>

43. Jurisdiction is proper pursuant to 28 U.S.C. § 1331 because plaintiffs bring claims under RICO, 18 U.S.C. § 1961-1968. Pursuant to 28 U.S.C. § 1367, this Court may exercise jurisdiction over plaintiffs' claims under the Kentucky Consumer Protection Act, KRS Chapter 367 and other state law claims because those claims and the RICO claims form a part of the same case or controversy under Article III.

44. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the plaintiffs' claims occurred in this district. Under 18 U.S.C. § 1965(a) and (b), venue is proper for plaintiffs' RICO claims because Fortune and other individual defendants reside in this district, and the ends of justice require that other parties residing in any other district be brought before the Court.

<u>FACTS</u>

45. On September 11, 2000, defendant Fortune was organized as a Kentucky corporation.

46. Since at least January 5, 2001, Fortune has been operating in Kentucky and other states.

47. Fortune purports to be a lawful and legitimate company engaged in "relationship marketing," which Fortune's website defines as "a method of distribution that involves an estimated

59 million people worldwide and is defined as the sale of a consumer product or service, person-to-person, away from a fixed retail location, marketed through independent sales representatives."[1]   .

48.    In reality, Fortune is the founder of an enterprise that is and always has been an illegal pyramid scheme.  This enterprise will hereinafter be referred to as the Fortune Pyramid.

### The Fortune Pyramid's Basic Structure

49.    The Fortune Pyramid operates by offering prospective participants the opportunity to become "Independent Representatives" ("IRs") who allegedly will "have the opportunity to earn a residual income over time by acquiring loyal customers and introducing the Fortune opportunity to others."[2]

50.    Fortune labels all individuals who participate in the Fortune Pyramid as IRs.

51.    Fortune compensates all of its IRs in accordance with what it terms a "multilevel marketing compensation plan."  *Id.*

52.    The basic terms of this compensation plan are set forth in a Policies & Procedures document produced by Fortune.

53.    From 2001 until at least July 1, 2010, Fortune utilized a Polices & Procedures document that sets forth a compensation structure that amounts to a fraudulent and illegal pyramid scheme, both by its very terms and by its implementation by Fortune in practice.  This Policies & Procedures document is attached as **Exhibit 1**.

54.    Prospective participants who meet certain basic criteria and desire to join Fortune enter the company as either a representative or a manager.  Although the Policies & Procedures provide that one may join the Fortune Pyramid as a representative for $75, Fortune's recruiting presentations usually do not offer prospective participants this option and instead encourage

---

[1] "What is Relationship Marketing?", http://www.fhtm.net/relationship.aspx
[2] "Why FHTM," http://www.fhtm.net/whyfhtm.aspx

participants to join as a manager, which requires the participant to pay $299. Although the Policies & Procedures document provides that this $299 is for the purchase of an "Optional Special Services Program," the defendants and others high in the pyramid frequently refer to the $299 fee in other terms.  Additionally, to remain a manager, one must pay Fortune an additional $199 each year.

55.    After paying at least $299 to join, a new Fortune manager then ostensibly has the opportunity to advance to the following higher positions within the company:

        A.    Qualified Representative[3]

        A.    Regional Manager

        B.    Executive Sales Manager

        C.    National Sales Manager

        D.    Presidential Ambassadors

56.    The basis for promoting managers to subsequent higher positions in the company is not success in selling products or services, but rather the recruitment and sponsorship of new Fortune managers by the manager and those in his or her "downline" (i.e., IRs below them on the pyramid).

**<u>Fortune's Compensation and Bonus Structure Is a Fraudulent Pyramid Scheme</u>**

57.    Under the Compensation Plan utilized by Fortune until at least July 1, 2010, IRs are able to earn compensation from two sources: (1) bonuses for recruiting and sponsoring new representatives; and (2) commissions from sales of products and services by themselves and by recruits in their "downline."

---

[3] Fortune's Policies & Procedures document also refers to "Qualified" Regional Managers, Executive Sales Managers, etc.  Only "Qualified" IRs are entitled to receive the bonuses and commissions to which an IR at their level of the pyramid is entitled.  However, the only distinction between being a regular Manager and a "Qualified" one is that, to be Qualified, a manager must have purchased the requisite amount of Fortune Goods or Services described below by the end of any given month.  Thus, for simplicity's sake, this complaint will refer to each level as simply "Regional Manager," "Executive Sales Manager," etc. without using the "Qualified" label.

58.     Fortune operates as an illegal pyramid scheme because this compensation plan affords IRs the right to receive in return for recruiting other participants into Fortune rewards which are unrelated to the sale of products or services to ultimate users outside of Fortune.  *See United States v. Gold*, 177 F.3d 472, 480 (6th Cir 1999) (quoting *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1187 (1975)).  Such a scheme is deemed inherently fraudulent under federal law.  *Id.*

**A.     Recruiting presentations by the defendants and others at the top of the Fortune Pyramid emphasize recruitment of new representatives over the sale of products and services to customers outside of Fortune.**

59.     In recruiting presentations, the defendants and other individuals at the top of the Fortune Pyramid, presenting official Fortune marketing materials, consistently emphasize recruitment of new members over sales or products and services to customers outside of Fortune.

60.     For example, defendant Joel McNinch stated during a Fortune recruitment presentation that is available online on YouTube: "When you build a group of 12 people – you sponsor three, and help them build nine total – 12, you promote yourself to regional sales manager. We just had a guy in Indian River, Michigan last week do it in one day."[4]

61.     In the same presentation, McNinch stated, "As a regional manager, every time you go out and personally enroll a new manager who gathers three customers, you're going to earn a $200 bonus."  *Id.*

62.     McNinch described the process of earning more bonuses as more representatives are recruited to join Fortune: "As these reps start to bring in reps, not only do you earn an override percentage of their customers, but you earn a $100 customer acquisition bonus for every rep that's gathered by any of your reps. . . . $100, $100, $100 unlimited for every rep that joins."  *Id.*

63.     Summarizing the emphasis on recruitment, McNinch stated, "We're not looking to sign you up and sell you something; we're looking for team members."  *Id.*

_____

[4] http://www.youtube.com/watch?v=F0sE2ID9bXo

64.     Recruiting new IRs into the Fortune Pyramid is similarly emphasized in presentations made by throughout the country by the individual defendants and other individuals at the top of the Fortune Pyramid.

65.     For example, in another presentation, defendant Misenheimer said that the key to making money in Fortune is to "get a rep, get a rep, get a rep, get a rep . . . [successful Fortune reps] are making money, but they don't understand what they're doing . . . The whole thing's about getting the preliminary stuff out of the way, and getting to regional [sales manager] fast."[5]

**B.     Official Fortune training materials emphasize recruitment of new members over the sale of products and services to actual end users outside of Fortune IR's.**

66.     Fortune provides IRs with written training materials.  Each plaintiff received some form of these materials from Fortune.

67.     These training materials clearly emphasize recruitment of new IRs, not the sale of products and services to end users.

68.     To illustrate, the materials received by plaintiff Haslag provide a list of "Business Building Steps," which is attached as **Exhibit 2.**

69.     This list provides guidance for recruiting new managers into Fortune.  It tells newly appointed managers, "You are not trained as a sales person and you should not act like one."  It further tells managers to tell prospective managers, "you don't have to be a salesperson" to succeed at Fortune.

70.     Furthermore, this list provides answers to hypothetical questions that a manager may face in attempting to recruit new managers.

---

[5] http://www.youtube.com/watch?v=lqLcrsXO1Hw&feature=related

71.     One such hypothetical question is, "Is this a pyramid?"  Fortune encourages representatives to respond as follows: "No.  Pyramids are illegal and I certainly wouldn't be involved in anything illegal.  Just let me show it to you."

72.     The Building Business steps encourage managers to quickly sign up new managers by requesting an answer from a prospective participant within a short period of time.

**C.    Bonuses paid to Fortune IRs are based upon recruiting others to join Fortune as managers.**

73.     Fortune's compensation plan involves an elaborate set of bonuses which are effectively the only way to earn money in Fortune and which are all tied not to real sales to outside customers, but rather to recruitment of new IRs.

74.     An IR receives a "Quick Start Bonus" of $100 for sponsoring a manager who acquires only three personal customer points within 60 days of the manager's enrollment.  Managers are told that these "customers" need not be actual customers not participating in Fortune, but rather purchases of Fortune products and services made by the manager him or herself. New managers are encouraged to make these three purchases the same day as they join the Fortune Pyramid, thus qualifying themselves immediately and triggering the Quick Start Bonuses to those above them on the Fortune Pyramid. Thus, a Quick Start Bonus is compensation for recruitment and is not based on actual product sales to end users outside of Fortune.

75.     Additionally, an IR may earn a "Quick Start Bonus Override" ("QSBO") whenever a manager within his or her downline receives a Quick Start Bonus.  If the new manager recruited in the downline falls on Level 2-7, the amount of the QSBO is $5.  If the new manager is on Level 8, the QSBO is $10.  Within the last year, these QSBO amounts have been raised to $15 for Levels 2-7 and $20 for Level 8.

76.     Once an IR becomes a Regional Sales Manager, he or she is eligible to receive customer acquisition bonuses.  These bonuses are based not on the acquisition of new customers, but rather on the recruitment of new managers into the Regional Sales Manager's downline.  The amount of the customer acquisition bonus is $100 for each new manager, to unlimited levels deep, who enters the QRSM's regional coded group and qualifies for a Quick Start Bonus.  If 16 such new managers enter the group, then the amount of the bonus is doubled to $200 per new manager.

77.     At the level of Executive Sales Manager and National Sales Manager, these "customer" acquisition bonuses become more lucrative as the Executive or National Sales Manager receives a bonus for each new manager in his or her downline that is recruited to join Fortune and qualifies for a Quick Start Bonus.

**D.     Fortune's "Trainer Coach" Program is merely another thinly veiled means of paying IRs for the recruitment of new IRs.**

78.     Fortune also encourages new participants to pay $299 (or slightly less in some states) to become a "Trainer Coach."  As a Trainer Coach, one purportedly will be paid $40 for the initial training of a new manager.  However, managers are not obligated to undergo such training. Many managers are simply trained on the use of their "Fortune Back Office" and sign a form, causing the $40.00 training fee to be paid.

79.     Trainer Coaches are required to pay an annual renewal fee of $100 to maintain their status as Trainer Coach.

80.     As with the advancement in the ranks of manager, IRs may advance to higher levels of trainers.  A Trainer Coach who becomes a Regional Sales Manager may become a "Certified Regional Trainer" for an additional $200.  A Certified Regional Trainer, in turn, receives $80 for training each new Trainer Coach.

81.     Certified Trainer Coaches can become eligible to receive bonuses tied directly to the training of new managers by any Trainer Coach in their "training downline."  However, a Certified Trainer Coach can become eligible for these bonuses only by sponsoring four active managers who are also Trainer Coaches.

82.     Thus, the Trainer Coach program amounts to nothing more than another means for Fortune to push IRs to recruit new participants into the Fortune Pyramid and to receive payment from IRs.

**E.     Commissions ostensibly earned on sales of products and services are, in fact, tied to recruitment of new managers.**

83.     Although Fortune's compensation structure allows IRs to earn commissions on the sale of Fortune products and services by themselves and those recruited in the eight levels below them, these commissions are relatively small compared to the bonuses that an IR can earn when new representatives are recruited to join Fortune in his or her downline.

84.     Even this commission structure rewards recruitment, not sales to customers outside the Fortune Pyramid, because IRs are encouraged to purchase Fortune products and services themselves or sell them to IRs they recruit rather than to sell them to customers outside the Fortune Pyramid.

85.     Fortune's commission structure makes this possible by allowing IRs to earn commissions on sales without ever actually selling anything to a customer outside the Fortune Pyramid.  In fact, prospective IRs are told while joining Fortune that they must purchase certain products to earn their first "customer points" and therefore allow bonuses to be paid to their sponsors.

86.     For example, until at least April 2010, new Fortune IRs were required to purchase a "Fortune Back Office" website that required a $20.00 setup fee and a $24.95 recurring monthly payment.  This website qualified as the IR's first customer point/customer.

87.     Fortune's commission structure allows IRs to earn commissions on sales of products and services by themselves, to themselves, and by those IRs they recruit to join the company for up to eight levels below them on the pyramid.

88.     To earn commissions on all eight levels, an IR is required to recruit and sponsor one new manager.  Thus, an IR's ability to receive commissions on the sale of any products is tied to recruitment of new individuals to join the Fortune Pyramid.

89.     An IR qualifies to receive commissions on sales by any IR he or she recruits personally (Level 1) by acquiring three "active personal customers" and one "personally sponsored Manager," i.e., a new Fortune IR.

90.     These "active personal customers" need not be actual human beings, let alone human beings outside of the Fortune Pyramid; rather, a product or service purchased from Fortune by the IR him or herself qualifies as a "customer" for purposes of allowing IRs to receive commissions and bonuses.  The "customer points" assigned to each Fortune product or service determine how much of any given Fortune product or service must be purchased to qualify as one customer.

91.     A "Customer Point Sheet" provided to new IRs explains what products or services may be purchased to qualify as a new "customer."  As an example, the purchase of $39.99 of True Essentials products by an IR counts as one "customer" and one "customer point."

92.     To obtain the required three customer points, new IRs are encouraged to merely purchase Fortune products and services themselves, rather than attempt to sell them to outsiders. Potential IRs are frequently told at recruiting meetings that they are already paying for the types of

products and services offered by Fortune – e.g., television, Internet service, cellular phone service, vitamins or travel – so they should simply switch from their current service provider to a product offered by Fortune.

93.     Although one of the three "customers" purportedly must be "other than his/her own personal or household account", Fortune neither tracks nor enforces this policy, and the policy itself permits this customer to be another IR.

94.     Thus, a new Fortune IR must recruit another manager and either purchase or sell three Fortune products or services in order to receive commissions on the products or services purchased or sold by the manager he or she recruits (Level 1 commissions).

95.     To earn commissions on Levels 2-7, an IR must acquire five customer points, i.e., purchase five Fortune products or services, and sponsor two managers.  There is no requirement that these customers be actual purchasers outside of the Fortune Pyramid.

96.     To earn commissions on Level 8, an IR must acquire 10 customer points, i.e., purchase ten Fortune products or services, and sponsor three managers.  There is no requirement that these customers be actual purchasers outside of the Fortune Pyramid.

97.     An IR who meets the requirements for earning Level 8 commissions – i.e., one who has purchases 10 Fortune products or services and personally sponsors three new managers – is eligible to receive the first promotion available within Fortune, to the position of Qualified Representative.

98.     To advance to the next level in the company, Regional Sales Manager, a Qualified Representative must develop a minimum of 12 managers within his or her first five levels, and need only maintain the same 10 "customer points" required to become a Qualified Representative.  Thus,

Qualified Representatives, to advance in Fortune, have an incentive solely to recruit and to ensure that those immediately below them recruit new managers into Fortune.

99.     During recruitment presentations, the individual defendants and others near the top of the Fortune Pyramid encourage prospective IRs to quickly advance to the level of Regional Manager in order to begin earning the bonuses described below.

100.     A Regional Sales Manager becomes a Qualified Regional Sales Manager merely by maintaining the 10 "customer points" that were necessary to be promoted to Qualified Representative and Regional Sales Manager.

101.     As set forth below in the description of Fortune's bonus structure, the benefit of advancing to each new level within the company is the eligibility for bonuses tied directly to the recruitment of new managers within an IR's downline.

102.     The next level in Fortune is Executive Sales Manager.  A Regional Sales Manager may be promoted to Executive Sales Manager by having 15 or more active personal "customer points," i.e., buying 15 products or services from Fortune, developing six Regional Sales Managers within a certain range on his or her downline; and developing a minimum downline organization of 90 managers within his or her downline.  Thus, advancement to ESM occurs only through recruitment.

103.     The second-highest level in Fortune is National Sales Manager.  To be promoted to this level, an IR need not acquire any more active customers.  But he or she must have six Qualified Executive Sales Managers in a portion of her downline; 90 managers in his or her Regional Sales Manager group, and 540 managers in his or her Executive Sales Manager group.  To be a Qualified National Sales Manager, the IR must maintain his or her 15 customer points at the end of the month.

104.    The highest level obtainable in Fortune is Presidential Ambassador.  A Presidential Ambassador need only have 15 personal customer points but must have three Qualified National Sales Managers within a certain portion of his or her downline; and a downline organization of 1620 managers in his or her National Sales Manager group and a monthly income exceeding $100,000. Presidential Ambassadors are appointed by Fortune, and, as a special bonus, they receive a share of the revenue/profits of the entire Fortune Pyramid.

105.    Advancement in Fortune is therefore tied directly to recruitment of new managers. As described below, the benefit of advancement in Fortune is the receipt of bonuses based on new members who are sponsored in one's downline.  These bonuses increase based on the IR's position in the company, which is obtained by recruiting new representatives.

**E.    Fortune misrepresents its relationships with the vendors of its products and services.**

106.    To perpetuate the fraudulent pyramid scheme described above, Fortune claims to have special relationships with or to be a "partner" of several large major national companies whose products and services Fortune offers.

107.    These companies include, but are not limited to, AT&T, Verizon Wireless, Sprint, Dish Networks, General Electric Security ("GE Security"), DuPont and Home Depot.  Fortune has used the trademarks of these and other companies in marketing materials and business presentations in order to convince prospective customers that Fortune is a legal business.

108.    In reality, Fortune does not have any sort of special relationship with these companies.  Fortune is not a "partner" with Dish Network.  Rather it is a third-party independent contractor authorized to sell Dish Network service.  There are numerous other such third-party vendors of Dish Network.[6]

---

[6] *See, e.g.*, http://www.vmcsatellite.com/red_design/program_overview.cfm.

109.   Counsel for Home Depot informed authorities in the state of Montana that Fortune has no partnership or sales agreement with Home Depot.

110.   GE Security also informed Montana authorities that Fortune has no direct relationship with GE Security or GE.  Instead, Fortune purchases GE Security products from Protect America, an authorized GE Security dealer.

111.   Fortune purchases all wireless products from Simplexity, a third-party online affiliate program of the wireless carriers. Fortune has no direct relationship with any of the nation's top wireless carries.

**F.   In furtherance of the illegal pyramid scheme, Fortune makes false claims about its legitimacy and success.**

112.   Defendants misrepresent that Fortune has been endorsed and/or praised by independent third-party companies and publications.  For example, defendant Joel McNinch stated during a recruiting presentation, currently available on YouTube, "Fortune isn't just going around saying, 'We're great, we're great.'  We've got third-party companies like *Millionaire Blueprint*, a nationwide publication, and *Success From Home* magazine preaching, you guys, how well this company's doing."[7]  In reality, upon information and belief, Fortune paid hundreds of thousands of dollars to several publications to produce and publish articles about Fortune containing misrepresentations about the success of the company.   These "articles" are actually paid advertisements.

113.   Defendants have further made representations that alleged "partners" of Fortune such as Dish Network have sent legal teams to verify the legality of Fortune's operation.  Defendants have also made representations that former high-level government attorneys represented Fortune and

---

[7] http://www.youtube.com/watch?v=F0sE2ID9bXo

ensured that it complied with the law and was legal in all 50 states.  All of these representations are false.

114.    Defendants and other individuals high in the Fortune Pyramid have made false representations that Fortune is licensed to transact business in every state and that its compensation structure must be approved by each state's financial regulators before such a license is given.

115.    In an effort to add legitimacy to the Fortune Pyramid's operations, the defendants have made representations that well known actors, athletes, businesspersons and politicians, including Chris Rock, Jerry Rice, Bob McDonnell, former Bank of America CEO Ken Lewis, and Judy Hammerschmidt, were affiliated IRs with Fortune.  A list of such famous individuals purportedly affiliated with Fortune is attached as **Exhibit 3**.

## Unconscionable Check and Electronic Funds Transfer Fees

116.    Fortune charges a $6.00 "administrative fee" for any weekly payment made by check to an IR.  Fortune also charges $5.00 for any weekly electronic payment made by the company to an IR.

117.    Prospective participants are not told about these fees prior to paying to join the Fortune Pyramid, nor are they described in any marketing materials produced by Fortune

## Cease and Desist Orders in North Dakota and Montana – Settlement

118.    Recognizing that the defendants operate an illegal pyramid scheme, regulators in North Dakota and Montana have taken action against Fortune.

119.    On December 10, 2009, the North Dakota Attorney General issued a cease and desist order against Fortune, ordering it to cease from doing business in North Dakota.  The North Dakota cease and desist order is attached as **Exhibit 4**.

120. In short, the North Dakota Attorney General alleged that, among other things, Fortune operated as a pyramid scheme illegal under North Dakota law.

121. On January 14, 2010, Fortune reached a settlement with the North Dakota Attorney General in which Fortune agreed to refund any North Dakota customer the entire amount he or she paid and to pay the Attorney General's investigation costs and attorney's fees. (**Exhibit 5.**)

122. On March 4, 2010, the Montana Commissioner of Securities issued a cease and desist order prohibiting Fortune from doing business in Montana and, likewise alleging that Fortune operated as an illegal pyramid scheme. (**Exhibit 6.**)

123. Fortune reached a settlement agreement with Montana requiring it to pay potentially over $800,000, including a $100,000 fine to the state treasurer and any refunds of enrollment fees that Montana IRs may seek. (**Exhibit 7.**)

124. As part of the Montana settlement, Fortune was also required to, among other things, train Montana IRs to emphasize the sale of products to customers outside of the Fortune Pyramid..

125. Fortune was also required to charge only $75 for new IRs to enroll in Montana.

126. Finally, Fortune was forced to disclose certain financial information. These Montana disclosures are attached as **Exhibit 8**.

127. The disclosures reveal that a very small number of individuals at the top of the Fortune Pyramid are making, on average, thousands of dollars per month, while the mast majority of Fortune IRs, who are in the lower rungs of the pyramid, earn virtually nothing.

128. For example, the disclosures show that:

A.    Nearly 30% of the active IRs earn nothing at all.

B.      Of those IRs that do earn something, over 54% are managers on the bottom rung of the pyramid.   These managers receive an average of only $93 per month from Fortune..

C.      National Sales Managers comprise just .38 % of the total number of paid IRs. On average, they earn $19,865 per month in commissions.

D.      Presidential Ambassadors constitute only .07% of paid IRs.   They earn an average of $103,416 per month in commissions.

**Following North Dakota and Montana, Fortune promulgates new Policies & Procedures**

129.    Following the cease and desist orders and subsequent settlements in North Dakota and Montana, Fortune has made various changes to its Policies & Procedures manual, including significant changes to the compensation structure.

130.    The new Policies & Procedures manual became available on Fortune's website in July 2010.

131.    Additionally, Fortune now purports to have a team of "Legal Council" consisting of former state attorneys general.[8]

132.    Fortune did not hire these individuals to its legal advisory team until May 2010.

**Plaintiffs are victims of Fortune's fraudulent schemes**

133.    Each plaintiff was induced to pay money to Fortune by numerous misrepresentations, including false claims that Fortune is a legitimate network marketing company and not an illegal pyramid scheme.

134.    As the direct and proximate result of such misrepresentations, each plaintiff was damaged.

---

[8] http://www.fhtm.net/legalcouncil.aspx

135.    Plaintiffs were also subjected to the administrative fees for payments from Fortune described above.

136.    Plaintiff Yvonne Day ("Day") was recruited to join Fortune by a Fortune IR whom Day knew and trusted.  For nearly a year, this IR attempted to persuade Day to join Fortune.

137.    Before agreeing to join Fortune, Day met with a Fortune executive sales manager. Day also was given and watched DVDs containing video presentations by defendants Paul Orberson and Joel McNinch.  In those videos, Orberson and McNinch made numerous false representations concerning Fortune's legitimacy and its purported relationship with entities such as Fortune Magazine.

138.    Day agreed to join Fortune in October 2008 without completing or signing any document that contained or referenced an arbitration clause.  Day never agreed to arbitrate any claims against Fortune.

139.    The IR who recruited Day to Fortune caused Day to become a Fortune IR by completing all necessary documents online outside of Day's presence using personal information obtained from Day.

140.    As a direct result of the defendants' promotion of and participation in the illegal pyramid scheme described above, Day paid $299 to join Fortune.

141.    As a direct result of the defendants' promotion of and participation in the illegal pyramid scheme described above, Day also paid $299 for the right to become a Trainer Coach for Fortune.

142.    As a direct result of the defendants' promotion of and participation in the illegal pyramid scheme described above, Day also paid $200 for the right to become a Certified Regional Trainer.

143.    Additionally, Day purchased numerous products from Fortune and suffered additional damages.

144.    Plaintiff Leonard Haslag ("Haslag") attended a Fortune recruitment meeting on September 10, 2009.  At this meeting, defendant Mike Misenheimer spoke.

145.    Misenheimer stated that recruiting new members into Fortune would allow participants to earn huge amounts of money.  Misenheimer claimed that prospective participants could earn up to $80,000 per month if they joined Fortune.

146.    At this meeting, and as a result of these and other representations by Misenheimer, Haslag completed a photocopied application to be a Fortune IR.  The application did not contain an arbitration clause and did not contain terms and conditions on the back of the document.  Haslag never agreed anywhere else to arbitrate claims against Fortune.

147.    Haslag then had second thoughts about joining Fortune and cancelled the credit card for which he had provided Fortune with information.

148.    Haslag ultimately decided to join Fortune shortly thereafter, however, and he called the IR who had sponsored him at the meeting to provide new credit card information.

149.    At this point, someone other than Haslag, outside of Haslag's presence, entered information into a website sufficient to cause Haslag to be registered as a Fortune IR.

150.    As a direct result of the defendants' promotion of and participation in the illegal pyramid scheme described above, Haslag paid $299 to join Fortune.

151.    Plaintiff James McCormick ("McCormick") attended a Fortune Saturday morning business meeting, conducted by National Sales Manager – Ken Bailey, prior to agreeing to join Fortune.

152.   After this meeting, McCormick completed a document bearing the Fortune logo that required him to submit his name, social security number, and credit card information for the purchase of his first three customer points. This document did not contain any agreement to arbitrate and did not reference arbitration or policies and procedures, in any way.

153.   McCormick has never seen any document pertaining to Fortune containing an agreement to arbitrate.

154.   Someone other than McCormick, outside of McCormick's presence, entered information into a website sufficient to cause McCormick to be registered as an Fortune IR.

155.   As a direct result of the defendants' promotion of and participation in the illegal pyramid scheme described above, McCormick paid $299 to join Fortune and was charged $100 each month until May 2010 for various Fortune products and services.

156.   McCormick was unable to sell any Fortune products to others or to recruit anyone to join Fortune as a manager.

157.   Plaintiff John Turner ("Turner") attended several meetings held by persons promoting the Fortune Pyramid.

158.   Eventually, Turner provided his social security number and credit card number by filling out a document that required him to submit such information. This document did not contain an agreement to arbitrate. Turner never agreed to arbitrate his claims against any of the defendants.

159.   As a direct result of the defendants' promotion of and participation in the illegal pyramid scheme described above, Turner paid $299 to join Fortune.

160.   As a direct result of the defendants' promotion of and participation in the illegal pyramid scheme described above, Turner paid $299 for the right to become a Trainer Coach for Fortune.

161.    As a direct result of the defendants' promotion of and participation in the illegal pyramid scheme described above, Turner also paid $200 for the right to become a Certified Regional Trainer for Fortune.

162.    Additionally, Turner purchased numerous products from Fortune and suffered additional damages.

## CLASS ACTION ALLEGATIONS

163.    This action is brought by plaintiffs as a class action pursuant to Federal Rule of Civil Procedure 23.

164.    Plaintiffs seek relief on behalf of themselves and a nationwide class of all persons who were Fortune independent representatives from January 2001 until present and who were injured as a result of the defendants' illegal pyramid schemes.  The defendants, their employees, and family members are excluded from the class.

165.    The members of the class number in the tens of thousands, making joinder of all class members in a single action impracticable.

166.    There are common questions of law and fact common to the class, including, but not limited to, the following:

A.    Whether the defendants operate and/or operated an illegal pyramid scheme;

B.    Whether Fortune's IRs paid money to the defendants in exchange for (1) the right to sell products or services and (2) the right to receive, in return for recruiting other into the program, rewards unrelated to the sale of products or services to retail consumers not affiliated with Fortune;

C.    Whether the defendants failed to inform plaintiffs that plaintiffs were entering into an illegal pyramid scheme in which the overwhelming majority of participants lose money;

D.      Whether the defendants made materially false representations that Fortune was legal and/or had been approved by governmental entities;

E.      Whether defendants engaged in acts of mail fraud and wire fraud in violation of RICO;

F.      Whether and to what extent defendants' conduct has injured plaintiffs and the class;

G.      Whether the defendants' conduct constitutes an illegal "pyramid distribution plan" under KRS 367.830(4);

H.      Whether the defendants' practice of charging a $6.00 "administrative fee" for each payment made by check to an IR and a $5.00 "transfer fee" for any payment made electronically to an IR are "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce" under KRS 367.170 that is actionable under KRS 446.070.

167.    These and other questions of law and/or fact are common to the class and the subclass, and predominate over any question affecting only individual class members.

168.    The plaintiffs' claims are typical of the claims of the class and the subclass in that plaintiffs were IRs for Fortune and lost money as a result of the pyramid scheme.

169.    The plaintiffs will fairly and adequately represent the interests of the class and the subclass in that plaintiffs' claims are typical of those of the class and plaintiffs' interests are fully aligned with those of the class. The plaintiffs have retained counsel who is experienced and skilled in class action litigation.

170.    Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously,

efficiently and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

171.　The plaintiffs know of no difficulty likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

## COUNT I: RACKETEERING ACTIVITY
## IN VIOLATION OF 18 U.S.C. § 1962(C) (VERSUS ALL DEFENDANTS)

172.　Plaintiffs re-allege each of the preceding paragraphs as if fully set forth here.

173.　Each defendant is a "person" for purposes of RICO, 18 U.S.C. § 1962, because each defendant is, and was at all relevant times, an individual or entity capable of holding legal or beneficial interest in property.

174.　All of the defendants in this action collectively form an "enterprise" under RICO, 18 U.S.C. § 1962, in that they are a group of individuals and entities associated in fact, although not a legal entity.

175.　In the alternative, the enterprise consisted of Fortune, which is controlled by defendants Paul C. Orberson, Jeff Orberson, Thomas A. Mills, David Mills, Billy Stahl, and Simon Davies.

176.　In the alternative, the Fortune Pyramid is an enterprise, in that it is an association in fact of all defendants and others which, although not gathered under any legal entity, operates the illegal pyramid scheme to draw new investors to Fortune.

177.　The defendants engaged in a pattern of racketeering activity by participating in a scheme and artifice to defraud in violation of the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.

178.    The defendants' promotion of an illegal pyramid scheme is a *per se* scheme to defraud under the mail and wire fraud statutes; thus, the defendants have committed racketeering acts by promoting an illegal pyramid scheme by using and causing others to use the mail and by transmitting and causing others to transmit, by means of wire in interstate commerce, writing, signs, signals, pictures and sounds, all in furtherance of and for purposes of executing a scheme or artifice to defraud, namely an illegal pyramid scheme.

179.    Each defendant has promoted the Fortune Pyramid.  Each use of the mail or wire by the defendants in furtherance of the Fortune Pyramid is therefore an act of racketeering.

180.    Moreover, the defendants have used false and fraudulent pretenses to deceive the plaintiffs and the class and to thereby obtain money and property from the same.  The defendants have engaged in materially misleading statements of facts and nondisclosure of particular facts, including:

A.    Creating the false impression that the Fortune Pyramid is legal and has been investigated and approved by several major national companies, as well as state governments, which purportedly would have closed Fortune permanently if it was an illegal operation.

B.    Creating the false impression that the majority of investors in the Fortune Pyramid will profit from their investment by merely working hard.

C.    Creating the false impression that Fortune has a unique business model that is unusually generous to investors.

D.    Creating the false impression that several magazine covers and articles used to induce investments in the Fortune Pyramid were articles written by objective third-parties, when in reality they were paid advertisements.

E.     Creating the false impression that several well known athletes, actors, politicians and successful business people were in fact Fortune IRs and endorsed the Fortune Pyramid;

F.     Failing to disclose that the purported success and wealth achieved by the individual defendants through their participation in the Fortune Pyramid is no longer possible and that Presidential Ambassadors represent only the top .07% of investors in the Fortune Pyramid who earned any money at all.

G.     Failing to disclose that nearly 30% of active participants in the Fortune Pyramid earn nothing at all.

181.   These and other misrepresentations at the heart of the defendants' enterprise were reasonably calculated to deceive a person of ordinary prudence and comprehension.

182.   Plaintiffs and the class relied on these misrepresentations.

183.   All of the defendants acted with intent to defraud.

184.   The defendants' numerous acts of mail fraud and wire fraud amount to a pattern of racketeering activity because they are related and continuous.  The pattern consists of more than two acts, which occurred from 2000 until present and consistently throughout that period.  The predicate acts of mail and wire fraud are related because they have had the same or similar purpose: to convince new investors to pay to join the Fortune Pyramid by paying money to do so, and to convince those investors to in turn recruit new investors.  They have the same result: convincing investors to join the Fortune Pyramid by paying money and having those investors recruit new ones to do the same.  They have the same participants: Fortune's executives, Presidential Ambassadors, and National Sales Managers, all of whom promote the Fortune Pyramid.  They have the same victims: plaintiffs and class members who were fraudulently deceived into investing in the Fortune

36

Pyramid.   Finally, they have similar methods of commission: fraudulent misrepresentations concerning numerous aspects of Fortune's operations made via online presentations, in-person gatherings, and written materials.  In short, the predicate acts of wire and mail fraud committed by the defendants constitute an intricately related set of predicate acts sufficient to meet the relatedness standard.

185.    Moreover, the predicate acts are continuous.  They pose a threat of continued illegal conduct in that the defendants continue to promote and operate the Fortune Pyramid and have expressed their intention to continue to do so. Additionally, the predicate acts have extended over a significant period of time – the nearly 10 years that Fortune has been in existence.  The defendants' regular business of attracting new independent representatives is conducted by ongoing mail and wire fraud that misrepresents that Fortune is a legitimate multilevel marketing enterprise and not an illegal pyramid scheme.  Without the repeated acts of wire and mail fraud, the defendants' fraudulent pyramid scheme would not be in existence.

186.    As a direct and proximate result of the defendants' acts of mail and wire fraud, plaintiffs and the class were injured in their business and property.  Each plaintiff was injured in his or her business or property by reason of the defendants' pattern of racketeering activity, in that plaintiffs surrendered valuable consideration of at least $299, and in most cases much more, in order to participate in the inherently fraudulent scheme promoted by the defendants.

187.    Each enterprise alleged above was engaged in, or affecting, interstate commerce by reason of, at least, each of the defendants' numerous acts or omissions constituting use of the mail or interstate wire communication facilities in furtherance of their scheme to defraud.  Additionally, each enterprise affected interstate commerce because the members comprising it engaged in business in several states and made use of the mail and interstate wire communication facilities in the process

of doing so by causing marketing and promotional materials for Fortune, as well as images, videos, and information to be communicated through regular mail and via the Internet.

188.     Each of the defendants is employed by or associated with each enterprise above to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, *i.e.*, conducting the affairs of, promoting, and otherwise supporting the pyramid scheme.

189.     Specifically, defendants Paul C. Orberson, Jeff Orberson, Thomas A. Mills, David Mills, Billy Stahl, and Simon Davies have overseen the creation of marketing materials containing misrepresentations regarding Fortune and have authorized the Presidential Ambassadors and National Sales Managers to direct conference calls, websites, web presentations and speeches that contain numerous misrepresentations and that deceive people into participating in the Fortune Pyramid.

190.     Pursuant to 19 U.S.C. § 1964, Plaintiffs are entitled to recover treble damages, costs, and attorneys' fees.

### COUNT II: RACKETEERING ACTIVITY
### IN VIOLATION OF 18 U.S.C. § 1962(A) (VERSUS ALL DEFENDANTS)

191.     Plaintiffs re-allege each of the preceding paragraphs as if fully set forth here.

192.     Revenue derived from the pattern of racketeering activity set forth above, which upon information and belief constitutes a significant portion of the defendants' total income, was reinvested into the Fortune Pyramid for at least the following purposes: (1) to expand the operations of the Fortune Pyramid through additional false and misleading advertising and promotional materials aimed at recruiting new participants in the Fortune Pyramid; (2) to facilitate the execution of the Fortune Pyramid; and (3) to convince existing participants in the Fortune Pyramid to recruit new ones, resulting in harm to plaintiffs and the class.

193.    Plaintiffs and the class were injured in their business or property as a result of such reinvestment into the Fortune Pyramid because they were induced, with funds used to establish new levels of the Fortune Pyramid, to invest in Fortune

194.    Pursuant to 19 U.S.C. § 1964, plaintiffs and the class are entitled to recover treble damages, costs, and attorneys' fees.

## COUNT III: CONSPIRACY TO COMMIT RACKETEERING ACTIVITY IN VIOLATION OF 18 U.S.C. § 1962(D) (VERSUS ALL DEFENDANTS)

195.    Plaintiffs re-allege each of the preceding paragraphs as if fully set forth here.

196.    The defendants conspired to violate 18 U.S.C. § 1962(a) and (c) in violation of 18 U.S.C. § 1962(d).

197.    Each defendant knew about and knowingly and intentionally agreed to participate in and promote an illegal pyramid scheme.  Specifically, the defendants had a meeting of the minds on an object and course of action, namely, to create, support, and maintain the pyramid scheme for their own financial benefit.

198.    Each of the defendants has committee multiple overt acts in furtherance of the unlawful objects of the pyramid scheme.

199.    The plaintiffs and the class were injured in their business or property as a result.

200.    Pursuant to 19 U.S.C. § 1964, plaintiffs and the class are entitled to recover treble damages, costs, and attorneys' fees.

## COUNT IV: INJUNCTIVE RELIEF UNDER 18 U.S.C. § 1964(A) AGAINST ALL DEFENDANTS

201.    Plaintiffs re-allege each of the preceding paragraphs as if fully set forth here.

202.    To prevent and restrain ongoing violations of 18 U.S.C. § 1962 by the defendants, the Court should order the defendants to divest themselves of any interest, direct or indirect, in the

enterprise; impose reasonable restrictions on the future activities or investments of the enterprise, including, but not limited to, prohibit the defendants from engaging in the same type of endeavor as the enterprise engaged in, or order dissolution or reorganization of the enterprise.

## COUNT V: KENTUCKY CONSUMER PROTECTION ACT
## (PYRAMID SALES ACT)

203.    Plaintiffs re-allege each of the preceding paragraphs as if fully set forth here.

204.    The defendants established, promoted, operated, and/or participated in a pyramid distribution plan as defined in KRS 367.830(4).

205.    Specifically, Fortune was and is a "plan, program, device, scheme, or other process by which a participant gives consideration for the opportunity to receive compensation or things of value in return for inducing other persons to become participants in the program." KRS 367.830(4).

206.    By establishing, promoting, operating, and/or participating in a pyramid distribution plan, defendants violated KRS 367.832 and KRS 367.160.

207.    Plaintiffs were damaged and suffered an ascertainable loss of money and/or property as a direct and proximate result of these violations, entitling plaintiffs to recover such damages under KRS 367.220 and KRS 446.070.

## COUNT VI: UNLAWFUL ACTS UNDER THE
## KENTUCKY CONSUMER PROTECTION ACT

208.    Plaintiffs re-allege each of the preceding paragraphs as if fully set forth here.

209.    By charging the $6.00 check fee and $5.00 electronic funds transfer fee, the defendants have engaged in unfair, unconscionable, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce in violation of KRS 367.170.

210.    The plaintiffs and the class were injured by such acts or practices and thereby are entitled to be compensated for their injury and to reasonable attorney's fees under KRS 367.220 and 446.070.

### COUNT VII: UNJUST ENRICHMENT (VERSUS FORTUNE)

211.    Plaintiffs re-allege each of the preceding paragraphs as if fully set forth here.

212.    As a result of charging check fees and electronic funds transfer fees, Fortune received payment from plaintiffs and the class.

213.    Fortune was not entitled to obtain those payments.

214.    Fortune actually appreciated the benefits of those payments.

215.    Retention of that benefit would be inequitable.

216.    Accordingly, the plaintiffs and the class are entitled to restitution.

### COUNT VIII: CONVERSION (VERSUS FORTUNE)

217.    Plaintiffs re-allege each of the preceding paragraphs as if fully set forth here.

218.    As a result of charging check fees and electronic funds transfer fees, Fortune converted property rightfully belonging to the plaintiffs and the class.

### PRAYER FOR RELIEF

219.    Plaintiffs and the class request the following relief:

A.    Certification of the class;

B.    Jury trial and judgment against the defendants;

C.    Damages in the amount of the named plaintiffs' and the class's financial loss as a result of defendants' conduct and for injury to plaintiffs' and the class's business and property, all as a result of defendants' violations of 18 U.S.C. § 1962(a),(c), and (d) and that such amount be tripled in accordance with 18 U.S.C. § 1964(c);

41

D.     Temporary and permanent injunctive relief enjoining the defendants from further unlawful, unfair, fraudulent, or deceptive acts, including, but not limited to, operating and supporting the Fortune Pyramid.

E.     Restitution and disgorgement of monies;

F.     The cost and expense of suit, including reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c);

G.     For general, compensatory, and exemplary damages in an amount yet to be ascertained; and

H.     For such other damages, relief, and pre- and post-judgment interest that the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a jury trial as provided by Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

/s/ R. Kenyon Meyer___
R. Kenyon Meyer
DINSMORE & SHOHL LLP
1400 PNC Plaza
500 West Jefferson Street
Louisville, Kentucky 40202
(502) 540-2300 (Telephone)
(502) 585-2207 (Facsimile)
kenyon.meyer@dinslaw.com

801964_4