UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

YVONNE DAY, et al.                    )
                                      )
        Plaintiffs,                   )        Civ. No. 10-cv-305-GFVT
                                      )
v.                                    )        **MEMORANDUM OPINION**
                                      )                **&**
FORTUNE HI-TECH                       )             **ORDER**
MARKETING INC., et al.                )
                                      )
        Defendants.                   )
                                      )

*** *** *** ***

Plaintiffs Yvonne Day, Leonard Haslag, James McCormick, and John W. Turner, on

behalf of themselves and a purported class of similarly situated individuals, claim that

Defendants Fortune Hi-Tech Marketing, Inc. and its high-level members carried out a pyramid

scheme at their expense.   Therefore, the Day Plaintiffs claim that they can recover damages

under various provisions of the Racketeer Influenced and Corrupt Organizations Act, the

Kentucky Consumer Protection Act, and the Kentucky Pyramid Sales Act.  The Fortune

Defendants move to dismiss these claims as improperly pled in the Complaint.  In relation to the

federal claims, the Fortune Defendants argue that the Complaint fails to detail what each of them

did wrong, lacks the requisite particularity in describing the alleged racketeering activity, and

relies on investment activity that is not improper under the RICO statutes.  The Fortune

Defendants argue that the state claims should also be dismissed due to a lack of a contractual

relationship and because the claims are barred by a prior action initiated by the Kentucky

Attorney General.  For the reasons that follow, the Fortune Defendants' motions to dismiss shall be **GRANTED** in part and **DENIED** in part.

I

Fortune Hi-Tech Marketing, Inc. was a Kentucky corporation that operated from September 11, 2000 to early 2013. During that time, Fortune held itself out to be a legitimate corporation that used "relationship marketing" to sell products through so-called "Independent Representatives." [R. 1 at 13-14].[1]  All members of Fortune are considered Independent Representatives, but various additional titles were given to those who had met certain criteria and therefore advanced to higher levels within the company's structure.  Participants could initially join Fortune for $75 as a "Representative," but recruitment presentations highly encouraged participants to pay $299 to join Fortune as a "Manager." [R. 1 at 14-15].  Fortune charged Managers a $199 fee each year and offered a "Fortune Back Office" website that required a $20 initial setup fee and a $24.95 recurring monthly payment. [R. 1 at 15, 21].  Successful Managers could advance to become Qualified Representatives, then Regional Sales Managers, followed by Executive Sales Managers, National Sales Managers, and finally Presidential Ambassadors. [R. 1 at 15].   At each level, Independent Representatives could earn compensation by "recruiting and sponsoring new representatives; and commissions from sales of products and services by themselves and by recruits in their 'downline.'" [R. 1 at 15].[2]

According to Fortune's policies and procedures, some of the compensation and

---

[1] Due to the procedural posture of the case, these facts are derived from the complaint and are generally accepted as true and viewed in the light most favorable to the Day Plaintiffs for the purposes of this motion.  *See Hill v. Blue Cross & Blue Shield of Mich.,* 409 F.3d 710, 716 (6th Cir. 2005).

[2] According to the Day Plaintiffs, a Fortune Independent Representative's "downline" included the individuals recruited to join Fortune either by the Independent Representative him or herself or by those recruited by the Independent Representative. [R. 141 at 6].

opportunity for advancement was tied to the sale of products. Only "Qualified" Independent Representatives had access to bonuses and compensation from recruitment of and sales by downstream Independent Representatives. The "Qualified" designation was placed before an Independent Representative's position in the company if that representative sold an adequate and predetermined quantity of Fortune products each month. [R. 1 at 22]. However, the Day Plaintiff's contend that this was a mere formality. According to the Day Plaintiffs, Fortune encouraged Independent Representatives to buy products themselves or to have new Independent Representatives purchase products when signing up instead of selling the products to third parties that were not part of the Fortune organization. [*Id*.] After joining Fortune, new Independent Representatives would generally purchase products themselves to earn "customer points" so that bonuses could be paid to their sponsors. The Complaint describes customer points as simply being the required amount of Fortune goods that must be purchased to receive benefits. [*Id*.] For example, in addition to paying fees to join Fortune as an Independent Representative, the Fortune Back Office website was often one of a new Independent Representative's first purchases. This purchase qualified as one customer point towards the three initially needed to become a "Qualified" member of the organization.

While modest commission and advancement could be made through selling services and products, the Day Plaintiffs contend that the focus of the organization and the source of most of the income and upward mobility were in the recruitment of members. [R. 1 at 18]. The Day Plaintiffs support this contention with several allegations which, at this stage in the action, this Court must accept as true. First, the Day Plaintiffs claim that top level Fortune managers and Independent Representatives encouraged new Independent Representatives to recruit new

members rather than sell goods to third parties. They cite to a YouTube recruitment video in which Presidential Ambassador Joel McNinch states, "As a regional manager, every time you go out and personally enroll a new manager who gathers three customers, you're going to earn a $200 bonus." [R. 1 at 16]. He went on to emphasize the significant amount of money to be earned and drew attention to the exponential effect of downline benefits in the organization. McNinch said, "As these reps start to bring in reps, not only do you earn an override percentage of their customers, but you earn a $100 customer acquisition bonus for every rep that's gathered by any of your reps…. $100, $100, $100 unlimited for every rep that joins." [R. 1 at 16]. McNinch summarized the presentation by stating, "We're not looking to sign you up and sell you something; we're looking for team members." [*Id*]. The Complaint also refers to Presidential Ambassador Mike Misenheimer, who gave a recruitment presentation in which he said the key to making money in Fortune is to, "get a rep, get a rep, get a rep . . . . The whole thing's about getting the preliminary stuff out of the way, and getting to regional [sales manager] fast." [R. 1 at 17].

The Day Plaintiffs allege that these sentiments were not limited to two Presidential Ambassadors but were enshrined in the official training materials. The written materials for "Business Building Steps" encourage Independent Representatives to feel comfortable with the fact that they can be successful without being salespersons. [R. 1 at 17]. The Business Building Steps handout then omits any discussion of techniques for selling products to third parties and focuses instead on approaching and inviting members of an Independent Representative's social circle to join Fortune themselves and become "partners" in the business. [R. 1 at 17; *See* Exhibit 2].

The Day Plaintiffs further allege that a significant portion of the compensation awarded to Independent Representatives was through bonuses that were given for recruiting new managers.  An Independent Representative received a "Quick Start Bonus" when he or she recruited and sponsored a new manager that was able to gain three personal customer points within his or her first sixty days of enrollment. [R. 1 at 18].  New members were highly encouraged to make these purchases themselves upon enrolling so that the Quick Start Bonus was awarded to the upstream Independent Representatives. [*Id*.]  In addition, there was a "Quick Start Bonus Override" that awarded $5 to an Independent Representative when a manager was recruited between two and seven levels downline.  If the newly recruited manager was on level eight, the Quick Start Bonus Override was $10. [*Id*.]  During the year prior to the commencement of this action, these amounts had been significantly raised.

Further recruitment bonuses could be realized once an Independent Representative rose to the level of Regional Sales Manager.  At this point, the Independent Representative could receive customer acquisition bonuses. When a new manager was recruited by Independent Representative on any level of a Regional Sales Manager's downline and that manager qualified for a Quick Start Bonus, the Regional Sales Manager received $100. [R. 1 at 19].  Once sixteen managers were recruited to the same downline group, the Regional Sales Manager received $200 per new recruit [*Id*].  These bonuses were even greater for those in the Executive Sales Manager or National Sales Manager positions as they received bonuses for each newly recruited manager in the downline that qualified for a Quick Start Bonus. [*Id*.]

Beyond the signup costs and the initial and recurring website costs, Fortune encouraged new Independent Representatives to pay $299 to complete the training to become a "Trainer

Coach." [R. 1 at 19]. This provided additional incentive for Independent Representatives to recruit and train new managers. Trainer Coaches were paid $40 for each new manager they trained. [*Id*.] This training could be as elementary as familiarizing new managers with use of their Fortune Back Office websites and having them sign a form. [*Id*.] Regardless of the training intensity, a participant paid $299 and a Trainer Coach was compensated $40 for training a new manager. Trainer Coaches were required to pay $100 per year to Fortune in order to maintain their status as an eligible Trainer Coach. [*Id*.] Just as the managers could advance up the pyramid by recruiting additional Independent Representatives, so too could Trainer Coaches increase their income by training others. When an Independent Representative became a Regional Sales Manager they could pay $200 to become a "Certified Regional Trainer." [R. 1 at 19]. Certified Regional Trainers were compensated with $80 payments for each new manager that they trained. [*Id*.]

For new Independent Representatives to be able to receive the actual commission for sales made by those in their downline, they had to recruit and sponsor a new manager. [R. 1 at 21]. Therefore, even some commission from legitimate sales to third party individuals outside the Fortune organization was triggered through the recruitment of additional managers. [*Id*.] After selling three Fortune products and recruiting a manager, an Independent Representative received commission on the products sold by managers they have recruited themselves. Though Fortune had a policy that no more than two of the three points initially earned can be from the Independent Representative's own household, the Complaint alleges that Fortune "neither track[ed] nor enforce[ed] this policy." [*Id*.]

Finally, the Day Plaintiffs state that the process of advancement through the company

provides factual support for their assertion that Fortune was a pyramid scheme focused on recruitment of members over product sales. According to the Complaint, by earning ten customer points the Independent Representative could earn commission on levels one through eight and could become eligible to be promoted from a new manager to a "Qualified Representative." [R. 1 at 22]. To be promoted to Regional Sales Manager, a Qualified Representative must have developed twelve managers within his first five levels and have ten active customer points per month. A Regional Sales Manager could advance to Executive Sales Manager by earning fifteen customer points per month, developing six Regional Sales Managers, and having a minimum of ninety managers within his or her downline. [R. 1 at 23]. Executive Sales Managers could advance to the second highest level in Fortune, National Sales Manager, by maintaining the fifteen customer points per month, having six Qualified Executive Sales Managers, ninety managers within the regional sales manager group, and 450 managers within the Executive Sales Manager group. [*Id.*] Finally, a National Sales Manager could advance to the highest rank within Fortune and become a Presidential Ambassador by maintaining fifteen customer points per month, having three Qualified National Sales Managers within part of their downline, 1,620 managers within his or her National Sales Manager group, and a monthly income in excess of $100,000. [R. at 24]. In addition to significant commission and downline bonuses, Presidential Ambassadors must also be appointed by the directors of Fortune as they are awarded a share of profits from the entire organization. [*Id.*] Therefore, the Day Plaintiffs allege that the entire advancement and compensation system within Fortune was directly related to recruiting new Independent Representatives and building a large downline network that would trigger continued bonuses through constant and ever-increasing recruitment efforts. [R. 1 at 24].

Plaintiffs Yvonne Day, Leonard Haslag, James McCormick, and John W. Turner, who were Independent Representatives with the organization, believe these facts show that Fortune and its high level agents were operating a pyramid scheme at their expense. They initiated the instant action in September 2011 to recover the damages under the Racketeer Influenced and Corrupt Organizations Act, the Kentucky Consumer Protection Act, and the Kentucky Pyramid Sales Act.[3] They assert claims against Fortune Hi-Tech Marketing, Inc., Paul Orberson (President and Founder),[4] Thomas A. Mills (Chief Executive Officer), David Mills (Chief Operating Officer), Jeff Orberson (Chief Business Officer), Billy Stahl, and Simon Davies, as well as several enumerated members of the two highest tiers of Independent Representatives, "Presidential Ambassadors" and "National Sales Managers."[5] Jeff Orberson, David Mills, Billy Stahl, and Simon Davies counter that the Day Plaintiffs have improperly pled their claims, which should be dismissed under Federal Rule of Civil Procedure 12(b)(6). Though these defendants have now settled and entered an agreed order of dismissal with the Day Plaintiffs,[6] their arguments have been incorporated by reference into numerous other motions to dismiss filed by the other named defendants, most of whom are proceeding *pro se*. Thus, while the settling

---

[3] Serveral judges have presided over this case and it was reassigned to the undersigned on April 8, 2014. [R. 145].

[4] Paul Orberson died after the motion to dismiss was filed. By separate Order the Court has granted a motion to substitute his Estate as party to this action. [R. 156]. However, for the purposes of simplicity, the Court shall reference Orberson in a manner consistent with the motion to dismiss.

[5] The Presidential Ambassadors mentioned in the complaint are: Ruel Morton, Todd Rowland, Ashley Rowland, Mike Misenheimer, Steve Jordan, Joel McNinch, and Chris Doyle. In addition, the complaint is filed against Todd & Ashley, Inc., a North Carolina corporation. The National Sales Managers included in the complaint are: Ken Brown, Jerry Brown, Bob Decant, Joanne McMahon, Terry Walker, Sandi Walker, Sherri Winter, Trey Knight, Kevin Mullins, Scott Aguilar, Molly Aguilar, Nathan Kirby, Dwayne Brown, Aaron Decker, Susan Frank, Ramiro Armenta, Angelina Armenta, Alexis Adame, Teresa Adame, Darla DiGrandi, Matt Morse, Matt Barrett, and Roberto Rivera. [R. 1 at 8-13]. For the purposes of this Order all defendants shall be generally referenced as the "Fortune Defendants."

[6] The Day Plaintiffs have reached a settlement agreement with the Estate of Paul Orberson, Thomas Mills, David Mills, Jeff Orberson, Billy Stahl, and Simon Davies, and the claims against them have, therefore, been dismissed with prejudice. [R. 157].

Defendants are no longer party to this action, the Court shall consider their arguments as they apply to the remaining defendants.

II

A

Generally speaking, the Fortune Defendants have filed their motions to dismiss pursuant to Rules 12(b)(6) of the Federal Rules of Civil Procedure. Federal Rule of Civil Procedure 12(b)(6) allows a defendant to seek dismissal of a complaint which fails to state a claim upon with relief can be granted. Fed.R.Civ.P. 12(b)(6). In reviewing a Rule 12(b)(6) motion, the Court "accept[s] all the Plaintiffs' factual allegations as true and construe[s] the complaint in the light most favorable to the Plaintiffs." *Hill v. Blue Cross & Blue Shield of Mich.,* 409 F.3d 710, 716 (6th Cir. 2005). For a claim to be viable, the complaint must, at a minimum, "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). Further, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly,* 550 U.S. at 570). "[A] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

B

Count One of the Complaint alleges that the Fortune Defendants violated the Racketeer Influenced and Corrupt Organizations Act as set forth in 18 U.S.C. §1962(c). Congress created a civil cause of action for RICO violations to, "prevent organized crime from obtaining a foothold

9

in legitimate business." *In re ClassicStar Mare Lease Litigation*, 727 F.3d 473, 483 (6th Cir.

2013).  Toward that end, §1962(c) states that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. 18 U.S.C. § 1962(c).

18 U.S.C. §1962(c).  To establish a cause of action under § 1962(c) the Day Plaintiffs must

adequately plead that the Fortune Defendants engaged in "(1) conduct (2) of an enterprise (3)

through a pattern (4) of racketeering activity." *In re ClassicStar Mare Lease Litigation*, 727 F.3d

at 483 (*Moon v. Harrison Piping Supply,* 465 F.3d 719, 723 (6th Cir.2006)).

The Fortune Defendants focus their objections on the fourth element, which requires a

showing of involvement in "racketeering activity."  "In order to establish 'racketeering activity'

the plaintiffs must allege a predicate act….under 18 U.S.C. § 1961(1)."  *Advocacy Org. for

Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir. 1999) (citing *Kenty v.

Bank One, Columbus, N.A.,* 92 F.3d 384, 389 (6th Cir.1996)).  Among these permitted predicate

acts are mail and wire fraud, which are alleged by the Day Plaintiffs in this case. *See* 18 U.S.C.

§1961(1).  Mail and wire fraud consist of: "(1) a scheme to defraud, and (2) use of the mails, or

of an interstate electronic communication, respectively, in furtherance of the scheme."

*Advocacy Org. for Patients & Providers*, 176 F.3d at 322 (citing *United States v. Brown,* 147

F.3d 477, 483 (6th Cir. 1998)); *see also*, *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668

F.3d 393, 404 (6th Cir. 2012).  As fraud is at issue, these elements must be pled with

particularity in order to meet the requirements of Federal Rule of Civil Procedure 9(b). *See

Heinrich*, 668 F.3d at 404.

To show racketeering activity through wire and mail fraud, the Day Plaintiffs allege in their Complaint that Fortune was a pyramid scheme, which used interstate electronic communication to perpetuate its fraudulent activities. According to Sixth Circuit precedent, "[u]nquestionably, an illegal pyramid scheme constitutes a scheme to defraud." *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 484 (6th Cir. 1999). Courts apply the Federal Trade Commission's *Koscot* Test to determine whether activity is properly characterized a pyramid scheme. *Id.* at 480 (quoting *Koscot, Inc., et al.*, 86 F.T.C. 1106 (1975)). The *Koscot* test states that, in general, pyramid schemes "are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users." *Id.*

Whether or not Fortune is actually pyramid scheme under the *Koscot* test, the Day Plaintiffs have alleged sufficient facts to make it plausible that it is. As previously discussed at great length, the Day Plaintiffs assert that Fortune focused on recruitment of new participants rather than the actual sale of products. The Complaint supports this claim with factual allegations detailing statements by high level officials, training techniques, corporate polices, compensation methods, and a corporate structure that emphasized recruitment over sales. Further, the Complaint alleges the use of interstate electronic communication in perpetuating the fraudulent scheme. According to the Day Plaintiffs' allegations, interstate electronic communication began immediately once joining Fortune as new Independent Representatives were required to purchase a "Fortune Back Office" website. [R. 1 at 21]. Additionally, when joining Fortune an Individual Representative entered his or her personal information and credit

11

card numbers into a company website resulting in interstate transmission of data and monies. [R. 1 at 29-32]. Thus, the complaint contains factual allegations making it plausible that Fortune engaged in a fraudulent scheme using the mail or wires.

The Fortune Defendants counter than such a showing is still not sufficient because under Rule 9(b), "Plaintiffs must allege both fraudulent misrepresentations *and* the use of the mail and/or wires as to *each* Defendant, with…specificity…" [R. 105-1 at 5] (emphasis in original).[7] However, this argument overstates what Rule 9(b) actually requires under these circumstances.

Federal Rule of Civil Procedure 9(b) states, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). Undoubtedly this requires plaintiffs to "identify with specificity the actions that each defendant has taken in furtherance of the alleged fraud," however, "the law makes no requirement that *each* defendant involved must have personally made a misrepresentation" or that *each* defendant "personally used the mail or wires." *In re ClassicStar Mare Lease Litig.*, 2011 WL 3608456 at *9-10 (E.D. Ky. Aug. 15, 2011). In addressing an argument similar to the one raised by the Fortune Defendants, another court in this District thoroughly set forth the appropriate standard:

> in order to meet the requirement that a RICO complaint describe the predicate acts of mail or wire fraud with particularity, a plaintiff must allege that each RICO defendant participated in a scheme to defraud knowing or having reason to

---

[7] Even if this were what was required of the Day Plaintiffs, it is quite unlikely that they would have access to this type of information without the benefit of discovery. Information such as dates, transactions details, and records of those recruited to Fortune by the individual Defendants would be held solely by the corporation and individual Defendants themselves. In reference to Rule 9(b) the Sixth Circuit has noted that the "rule may be relaxed where information is only within the opposing party's knowledge….Especially in a case which there has been no discovery, courts have been reluctant to dismiss the action where the facts underlying the claims are within the defendant's control." *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988).

anticipate the use of the mail or wires would occur and that each such use would further fraudulent scheme. Neither 18 U.S.C. §§ 1341 nor 1343, the mail and wire fraud statutes, require that the defendant personally make the relevant communication, only that his actions cause another to use the mail or wires. *To satisfy the particularity requirement, a plaintiff need only allege that each RICO defendant participated in a scheme to defraud knowing or having reason to anticipate the use of the mail or wires would occur and that each such use would further the fraudulent scheme….*It is not necessary to allege that the defendants have personally used the mail or wires; it is sufficient that a defendant 'causes' the use of the mails and wires.

*Id.* at *10 (citing *SKS Constructors, Inc. v. Drinkwine,* 458 F.Supp.2d 68, 76 (E.D.N.Y.2006);

*Beard v. Worldwide Mortgage Corp.,* 354 F.Supp.2d 789, 802–803 (W.D.Tenn.2005) (citing

*United States v. Cantrell,* 278 F.3d 543, 546 (6th Cir.2001)); *United States v. Brown,* 147 F.3d

477, 488 (6th Cir.1998); *United States v. Oldfield,* 859 F.2d 392, 400 (6th Cir.1998)) (internal

quotation marks and citations omitted) (emphasis added).

The Day Plaintiffs did not include in their complaint an exhaustive listing of the date,

time and content of each misrepresentation furthering the fraudulent scheme that each defendant

made using mail or wires. However, this is not required. As stated above, alleging that the

Fortune defendants "had a knowing connection with a pattern of racketeering activity by an

enterprise of which [they were] a part [is] enough to state a RICO claim." *Id.* (citing *Mackenzie

v. Murphy,* 178 F.3d 1295, 1999 WL 115485 at *3 (6th Cir.1999)). The Day Plaintiffs have

sufficiently made this showing. First, the Day Plaintiffs have, as discussed, provided significant

factual details about when, where, and how Fortune executed a fraudulent scheme using

interstate electronic communication. Further, the Day Plaintiffs classify each of the remaining

defendants as having been at least a Presidential Ambassador or National Sales Manager at

Fortune, and the Defendants have not denied this characterization. To qualify as a Presidential

Ambassador with Fortune, an Independent Representative was required to have "a 'downline' (i.e., the individuals recruited to join Fortune either by the IR him or herself or by those recruited by the IR) of at least 1620 IRs within her 'National Sales Manager group' (i.e., within a certain degree of proximity to having been directly recruited by the Presidential Ambassador)…and three National Sales Managers within his or her downline and to have a monthly income of $100,000." [R. 141 at 6]. To qualify as a National Sales Manager, an Independent Representative was required to have "recruited six people into his or her downline who rose to the level of executive sales manager (the level below National Sales Manager), to have 90 or more IRs in his or her Regional Sales Manager Group, and to have 540 IRs in his or her Executive Sales Manager Group." [*Id.*] The detailed analysis of the internal structure of Fortune contained in the Complaint revealed that the process of recruiting others to Fortune and advancing through the hierarchy involved the use of individualized corporate websites and transmission of personal and payment information through these websites or the mail. Thus, by alleging that each of the remaining defendants had achieved the positions of Presidential Ambassadors and National Sales Managers, the Day Plaintiffs inherently alleged that "each RICO defendant participated in a scheme to defraud knowing or having reason to anticipate the use of the mail or wires would occur and that each such use would further fraudulent scheme." *In re ClassicStar Mare Lease Litig.*, 2011 WL 3608456 at *10.

In short, the Day Plaintiffs plead sufficient facts to state a §1962(c) RICO claim under Rule 12(b)(6). The Complaint also alleges the racketeering activity of the Fortune Defendants with sufficient particularity to meet the pleading requirements of Rule 9(b). Therefore, the Fortune Defendants' Motion to Dismiss on these grounds shall be denied.

14

B

The Fortune Defendants next attack the Day Plaintiffs' RICO claims asserted under 18

U.S.C. § 1962(a).  Section 1962(a) states as follows:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).  In Count Two of their Complaint, the Day Plaintiffs allege that the Fortune

Defendants reinvested income from previous racketeering profits to: 1) expand operations of

Fortune, 2) facilitate continued operation of Fortune, and 3) convince current members of the

Fortune to continue recruiting new members, resulting in injury to the Plaintiffs. [R. 1 at 38-39].

In the view of the Fortune Defendants, however, mere reinvestment of illegally obtained

proceeds of the type alleged by the Day Plaintiffs is not prohibited under § 1962(a).  As a result,

the Fortune Defendants argue that this claim should be dismissed because the Complaint fails to

allege a discernable injury from the investment of any funds from a predicate act.

The Fortune Defendants are not the first alleged RICO violators to make this argument.

In *Newmyer v. Philatelic Leasing, Ltd.*, the Sixth Circuit considered a similar case in which

reinvested proceeds were at issue, and it expressly rejected an argument that the plaintiffs could

not have been damaged by what the defendants did after receipt of the payments.  888 F.2d 385,

396 (6th Cir. 1989).  According to the court, "[t]his conclusion is erroneous….because it

overlooks the possibility that the offering of the particular investment plan in which the plaintiffs

put their money may have been financed with the proceeds of prior 'racketeering activity'." *Id.*

The court concluded, "if the defendants used income derived from racketeering activity in 1980 and 1981 to establish and operate the alleged scam in which the plaintiffs put their money in 1982 and 1983, we do not see why it would be impossible for the plaintiffs to show that they had been injured by a violation of § 1962(a)." *Id.* In other words, *Newmyer* stands for the proposition that "plaintiffs could have been injured by the investment itself if the investment plan into which they put their money (i.e., the enterprise) was itself funded with monies from *prior* racketeering against *prior* victims" *Vemco, Inc. v. Camardella,* 23 F.3d 129, 133 (6th Cir.1994) (citing *Newmyer*, 888 F.2d at 396); *See also Cook v. Easy Money of Kentucky, Inc.*, 196 F. Supp. 2d 508, 514 (W.D. Ky. 2001).

From all appearances, this is what the Day Plaintiffs are claiming that the Fortune Defendants did. The Complaint alleges that the defendants reinvested income from racketeering profits to expand the operations of Fortune, facilitate continued operation of Fortune, and then convince current members of Fortune to continue recruiting new members like the Day Plaintiffs. In the Sixth Circuit, this is enough to state a claim under § 1962(a), and the Fortune Defendants' motion to dismiss on this ground shall, therefore, be denied.

C

The Fortune Defendants also argue that the Day Plaintiffs' claims advanced under 18 U.S.C. §§ 1962(d) & 1964(a) should be dismissed. However, the only reason for this result advanced by the Fortune Defendants is "because Plaintiffs have failed to allege viable claims under 18 U.S.C. § 1962(a) or (c)." [R. 105-1 at 9-10]. Since, as discussed, dismissal of the Day Plaintiffs' claims under 18 U.S.C. § 1962(a) and (c) is not appropriate, the Fortune Defendants' motion to dismiss the §§ 1962(d) and 1964(a) claims shall also be denied.

The Fortune Defendants next argue that the Day Plaintiffs' state law claims should be dismissed. The Complaint raises two separate state law claims against the remaining defendants, both of which are labeled as violations of the Kentucky Consumer Protection Act. The first claim is for violations of the Pyramid Sales Act under KRS 367.830 and the second claim is for general unlawful acts under KRS 367.170. According to the Complaint, violations of these statutes are actionable under the private rights of action provided in KRS 367.220 and KRS 446.070. The Fortune Defendants claim that the Day Plaintiffs must have pled that they were in privity of contract with them in order to recover under these statutes and their failure to do so merits dismissal.

Section 367.170 of the Kentucky Consumer Protection Act makes unlawful any "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." KRS 367.170. In addition to powers attributed to state actors including the Kentucky Attorney General, the KCPA also provides a private right of action for consumers harmed by violators of this section. In its entirety, KRS 367.200 states as follows:

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by KRS 367.170, may bring an action under the Rules of Civil Procedure in the Circuit Court in which the seller or lessor resides or has his principal place of business or is doing business, or in the Circuit Court in which the purchaser or lessee of goods or services resides, or where the transaction in question occurred, to recover actual damages. The court may, in its discretion, award actual damages and may provide such equitable relief as it deems necessary or proper. Nothing in this subsection shall be construed to limit a person's right to seek punitive damages where appropriate.

KRS 367.220(1). With very limited exception, Kentucky courts and the courts in this district

have interpreted this provision to include a privity of contract element.[8] *Williams v. Chase Bank USA, N.A.*, 390 S.W.3d 824, 829 (Ky. Ct. App. 2012) ("The Kentucky Supreme Court has construed this provision to mean that an individual must be a purchaser with privity of contract in order to have standing to bring an action under the Act."); *Skilcraft Sheetmetal, Inc. v. Kentucky Mach., Inc.*, 836 S.W.2d 907, 909 (Ky. Ct. App. 1992) ("The legislature intended that privity of contract exist between the parties in a suit alleging a violation of the Consumer Protection Act."); *Massachusetts Mut. Life v. Watson*, CIV.A. 12-19-KKC, 2012 WL 4936504 (E.D. Ky. Oct. 16, 2012) ("A valid claim under the KCPA requires privity of contract between the parties."); *Espinosa v. Louisville Metro Gov't*, CIV.A. 10-354-JBC, 2011 WL 588468 (E.D. Ky. Feb. 10, 2011) ("The claim under the Kentucky Consumer Protection Act fails because Espinosa is not a consumer under the statute as he fails to provide any facts to show privity of contract between himself and the defendants.").

   The Day Plaintiffs do not attempt to characterize their complaint as alleging that there was ever any privity of contract among the parties in this case. Instead, they argue that privity is not a required element for private recovery under the Kentucky Consumer Protection Act. Against the weight of numerous cases expressly stating the contrary position, the Day Plaintiffs cite *Craig & Bishop, Inc. v. Piles*, which states that "[n]othing in the KCPA – particularly KRS 367.170 and KRS 367.220—explicitly requires that a binding contract be reached for a purchaser damaged by unlawful trade practices to have a private right of action." 247 S.W.3d 897, 903-04 (Ky. 2008). This holding, however, does not appear to be a full repudiation of the requirement

---

   [8] "'Privity of contract' is '[t]he relationship between parties to a contract, allowing them to sue each other but preventing a third party from doing so.'" *Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 579 (Ky. 2004) (citing BLACK'S LAW DICTIONARY 1217 (7th ed.1999)).

of privity of contract, but is more properly understood as an exception made by the Kentucky courts under the limited and unusual circumstances of that case. In *Craig & Bishop*, the defendant car dealership negotiated the purchase of a car with the plaintiff, which included representations about securing financing, the defendant taking possession of the plaintiff's old car as a type of down payment, and the plaintiff driving home in the new car. 247 S.W.3d at 900-01. While the parties did sign some documentation, they did not complete a Retail Installment Contract. *Id*. When the financing fell through, the deal soured and a lawsuit ensued. *Id*. Under those circumstances, the court found that the absence of a legally binding contract did not detract from the fact that these prospective car buyers constituted purchasers under the KCPA. *Id*. at 903; *See also McIntosh v. E-Backgroundchecks.com, Inc.*, CIV.A. 5:12-310-DCR, 2013 WL 1187038 at *5 (E.D. Ky. Mar. 20, 2013).

In contrast, the portion of the complaint alleging a violation of the KCPA does not mention a contract, purchase, or negotiation, but, instead identifies certain fees for checks and electronic funds transfer. Neither these, nor any of the other allegations of the Complaint, allow the Court to plausibly infer anything approximating privity of contract between the Day Plaintiffs and the remaining defendants. As such, their state law claims under KRS 367.170 shall be dismissed.[9]

This conclusion does not, however, necessarily mean that the Day Plaintiffs' claims under the Pyramid Sales Act must suffer the same fate. As an initial matter, the parties have not cited, nor has the Court uncovered, any case law interpreting the Kentucky Pyramid Sales Act,

---

[9] To the extent that the Day Plaintiffs believe that there are unplead factual allegations supporting the presence of privity of contract, they may seek leave to file an amended complaint that clearly contains these facts.

which does not require privity of contract or address whether there is an applicable private right of action by its express terms. The cases cited above are in the context of claims under KRS 367.170 and draw the privity of contract requirement from the private right of action contained in KRS 367.220. The express language of KRS 367.220, previously quoted above, purports to provide a remedy only for violations of the unlawful conduct described in KRS 367.170. Later in Chapter 367, the General Assembly addresses defective new cars, and provides that a violator of those statutory sections "may bring an action under the provisions of KRS 367.220 for relief." KRS 367.843. In contrast, the Pyramid Sales Act, contained in Section 832 of the same Chapter, only indicates that the Attorney General may enforce its provisions and does expressly provide a private right of action under KRS 367.220 or otherwise. Considering all of these statues together, it appears that the Kentucky General Assembly purposefully did not make the Kentucky Pyramid Sales Act actionable by private parties under KRS 367.220. Therefore, the privity of contract requirement of KRS 367.220 is inapposite to the Kentucky Pyramid Sales Act claim. The possibility remains that a private right of action under the KSPA might be brought under another statute that does not require privity of contract such as KRS 446.070,[10] which was also cited as a basis for recovery in the Complaint. However, as the Fortune Defendants do not challenge whether KRS 446.070 could properly support the Pyramid Sales Act claim, it is sufficient for the purposes of resolving the present motion to find that that claim need not be dismissed for their failure to allege privity of contract.[11] [12]

---

[10] KRS 447.070 states that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation."
[11] Though the Day Plaintiffs' claims under KRS 367.170 also sought recovery under KRS 446.070, such recovery would not be appropriate since the statute included its own private right of recovery. *See Thompson v. Breeding*, 351 F.3d 732, 736 (6th Cir. 2003) (recognizing that "'[w]here the statute both declares the unlawful act and specifies the civil remedy available to the aggrieved party, the aggrieved party is limited to the remedy provided by the

Additionally, the Fortune Defendants further argue that, even if privity of contract is not required, the Day Plaintiffs' state laws claims have been released by the Kentucky Attorney General through a settlement agreement between the Federal Trade Commission and Fortune.[13] They claim that the Kentucky Attorney General will establish a fund to compensate injured parties and that acceptance of compensation from this plan would leave the Plaintiffs without standing to bring this action. However, neither of these arguments is availing. As an initial matter, none of the remaining defendants in this case were a party in the previous action involving the Kentucky Attorney General. Additionally, to the Court's knowledge, the Kentucky Attorney General has not yet distributed any money to the Day Plaintiffs, and, therefore, the Defendants are asking this Court to dismiss the Plaintiffs action on purely speculative grounds. Because these arguments do not justify dismissal of the Day Plaintiffs' state law claims under the Kentucky Pyramid Sales Act, the Fortune Defendants' motion to dismiss on those grounds shall be denied.

E

In addition to incorporating the previously discussed substantive arguments of Jeff Orberson, David Mills, Billy Stahl, and Simon Davies, the remaining individual defendants also make several unsupported statements in their independent motions to dismiss that may be addressed somewhat summarily.

First, most of the individual defendants state that the claims against them should be

---

statute,' *Grzyb* [v. *Evans*, 700 S.W.2d 399, 401 (Ky. 1985)], and may not sue under section 446.070.").
[12] The Court does not herein decide whether KRS. 447.070 allows for a private right of action for violations of KRS 367.832.
[13] The Fortune Defendants reference *Federal Trade Commission et al v. Fortune Hi-Tech Marketing, Inc. et al*, Case No.13-cv-123-GFVT.

dismissed "because at all relevant times I have been an Independent contractor for Fortune Hi-Tech Marketing, Inc., with no management authority or control; and the complaint does not allege any specific wrongful act by me and does not even mention my name except to identify me." [*See e.g.*, R. 120 at 1]. As an initial matter, it is unclear what relevance can be attached to the fact that the defendants were independent contractors. Certainly, it does not matter for RICO purposes that they did not have the primary authority to manage Fortune's affairs as they satisfy the "operation or management" test "by making decisions on behalf of the enterprise *or by knowingly carrying them out.*" *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 792 (6th Cir. 2012) (citing *United States v. Fowler,* 535 F.3d 408, 418 (6th Cir.2008)) (emphasis in original). As has been previously discussed, the Complaint might not give a detailed list of what each defendant did, but it does identify that each achieved the levels of Presidential Ambassador or National Sales Manager, which necessarily involved knowingly carrying out Fortune's activities. Therefore, these reasons are not, at least without further clarification, sufficient to justify dismissing the Day Plaintiffs' claims at this stage of the proceedings.

Finally, several of the independent motions to dismiss from the individual plaintiffs claim that they are from another state and that the federal courts of Kentucky do not have personal jurisdiction over them. In determining whether a Plaintiff has shown that personal jurisdiction exists, a district court has three procedural alternatives: "[it] may determine the motion on the basis of affidavits alone, or it may permit discovery in aid of the motion, or it may conduct an evidentiary hearing on the merits of the motion." *Jude v. First Nat. Bank of Williamson*, 259 F. Supp. 2d 586, 589 (E.D. Ky. 2003) (citing *Dean v. Motel 6 Operating L.P.,* 134 F.3d 1269, 1272

(6th Cir.1998)).  Here, the individual defendants have done no more than state that they are residents of other states.[14]  Beyond this, the individual defendants provided no supporting affidavit, no additional information, and no reply to the Day Plaintiffs' thorough and compelling arguments that personal jurisdiction does exist under the jurisdictional provisions of RICO as well as through the general minimum contacts analysis.  Therefore, to allow for a more fully developed record on this issue, the Court shall deny the motion to dismiss on this ground without prejudice to allow for discovery of information pertaining to personal jurisdiction.

### III

Accordingly, for the aforementioned reasons, it is hereby **ORDERED** as follows:

(1)     The Defendants' Motion to Dismiss [R. 105, 109, 110, 111, 112, 115, 116, 117, 118, 119, 120, 121, 122, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 143] are **GRANTED** in part **DENIED** in part;

(2)     The Motions to Dismiss are **GRANTED** as to the Day Plaintiffs' state law claims under KRS 367.170 and KRS 367.220 of the Kentucky Consumer Protection Act;

(3)     The Motions to Dismiss are **DENIED** as all federal RICO claims and claims under KRS 367.832 of the Kentucky Pyramid Sales Act;

(4)     All remaining Defendants shall file their answers or otherwise respond to the Plaintiffs' Complaint no later than twenty-one (21) days from entry of this Order or risk default. As nearly four years have passed since the initial filing of this complaint, further extensions of

---

[14] Of course, physical presence is not dispositive of whether this Court has personal jurisdiction.  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) ("Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted.").

time to respond shall not be lightly granted.

This 3rd Day of September, 2014.

Signed By:

*Gregory F. Van Tatenhove*

United States District Judge